Argued and submitted November 30, 1990, convictions affirmed and remanded for resentencing September 25, reconsideration denied November 27, 1991, petition for review denied January 21, 1992 (312 Or 588)

# STATE OF OREGON,
*Respondent,*

*v.*

# GERALD ALLEN BATTY,
*Appellant.*

(87-CR-611; CA A49000)

819 P2d 732

Diane L. Alessi, Deputy Public Defender, Salem, argued the cause for appellant. With her on the brief was Sally L. Avera, Public Defender, Salem.

Ann Kelley, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

DE MUNIZ, J.

## DE MUNIZ, J.

A jury convicted defendant of murder, ORS 163.115, and of unauthorized use of a vehicle. ORS 164.135. We affirm defendant's convictions but remand for resentencing.

■ At the close of the state's case in chief, defendant moved for a judgment of acquittal on the charges. He assigns error to the court's denial of those motions. In ruling on the sufficiency of evidence, we view the evidence in the light most favorable to the state. The question is whether a rational trier of fact could find that all of the elements of the crime were proved beyond a reasonable doubt. *State v. King,* 307 Or 332, 339, 768 P2d 391 (1989).

■ Defendant argues that the evidence did not show that the victim, his girlfriend, died of criminal homicide or that he was involved in her death. The victim had been decapitated; her body had been sawed in two at her lower pelvis. Partially burned bones and internal organs from her body were recovered from a smoldering fire behind defendant's house. A bullet was found close to what was left of the victim's torso. A pathologist testified that injuries in the remains were consistent with death caused by a gunshot. The evidence was sufficient to permit a jury to find beyond a reasonable doubt that the victim died as the result of criminal homicide.

The evidence of defendant's guilt was circumstantial. No one saw defendant fire the gun, cut up the body and place it on the fire. The murder weapon was never found. However, at a minimum, the evidence established a motive and placed defendant at the scene of the crime a few hours before the body was discovered. The issue is whether the circumstantial evidence was sufficient to enable the jury to infer beyond a reasonable doubt that defendant committed the murder.

The evidence showed that the victim had lived with defendant in a house near Cave Junction for about four years. Homes in the area are on five-acre plots. Defendant's teenage son, Bart, and his companion, Kim, lived in a trailer not far from the house. A man named Howard Gray and defendant were participants in an outdoor marijuana farm at a remote

location near the California border. The victim told defendant, Kim and Bart that she was involved in a plot with Gray to kill defendant and steal money that he had hidden in the wall of the house and to take the profits from the marijuana operation. The next day, defendant became very angry with the victim and slapped her twice, bruising her and cutting her lip.

About a week later, Bart and Kim left home, telling defendant that they were going to be away for several days on a trip. The next day, about 7 p.m., several neighbors heard a gunshot from the direction of defendant's property. One heard three shots. Another heard a male voice scream, "Get out! Get out!" at the time the shots were fired. About two hours later, defendant went to the home of two friends, Tim and Mary Ellen Lynn. He was agitated and frightened. He said that the victim and others were out to kill him. They encouraged him to stay the night. Defendant telephoned his mother at about 9 p.m. and repeated to her what he had told the Lynns. He said that he was at a friend's house.

Defendant crawled out of the Lynns' guest room window, drove to his house in the middle of the night and burned several plastic garbage bags that were full of trash. While he was burning the trash, defendant claimed that, at about 5:30 a.m., someone appeared in the shadows and said, "You're a dead man." Defendant said that he saw one or possibly two other persons. He ran away. He testified that they chased him through the woods but that he doubled back and attempted to start the van that he had driven to and from the Lynns' house. It would not start. He then ran to his neighbors' house. Their car was parked in front and, as usual, had the keys in it. Defendant, without asking permission, took the car and drove to the Lynns'. He did not call the neighbors from the Lynns' and tell them what had provoked him to take their car.

About 10:30 that morning, defendant's mother and sister, concerned about his welfare, went to his house. They noticed a fire smoldering on the ground behind the house and discovered that it contained a partially burned body. They were afraid that it was defendant's body but, after scraping ash and dirt from the teeth of the victim, the sister realized that it was defendant's girlfriend. They promptly notified the

police. They did not communicate with defendant, because they only knew that he was at "Tim's" house, someone they did not know.

Later that day, after eating and showering, defendant telephoned his mother from the Lynns'. His sister told him about finding the victim's body. Only then did defendant tell the Lynns about the purported attack on his life earlier that morning. With the help of Timothy Lynn, defendant drove the stolen car to a remote area, hid it in the woods and abandoned it. He threw his shoes into the woods and told the Lynns to lie and say that they had picked him up the previous evening and that he had stayed the entire night at their house. Defendant then telephoned the police, who came and arrested him.

Defendant's theory of the case was that the victim's co-conspirators had turned on her, killed her and burned her body in the fire after he escaped from them. The state's theory was that defendant shot the victim, went to the Lynns' house to establish an alibi and then surreptitiously returned to his house to burn her body during the night. The evidence was sufficient to enable the jury to convict defendant of both crimes.

Defendant assigns error to a number of rulings excluding evidence. The first involves testimony from defendant's mother in which she repeated statements that defendant made in the telephone call from the Lynns' house the night before the body was found. To establish a possible motive for the murder, the prosecutor, without objection, elicited testimony on direct examination that defendant told his mother that the victim had made arrangements for someone to kill him and that he did not know why. On cross-examination, she was asked:

"[Defense counsel:] Did [defendant] tell you about anything that had led up to this conclusion of his that these people were in danger?

"A: Yes.

"* * * * *

"Q: And what did he, how did he describe the progression of events? How did it start? How did it develop as he told you about it?"

The state objected, arguing that the questions called for inadmissible hearsay and for evidence that was irrelevant. Defendant countered that the evidence was admissible and relevant, because it showed defendant's "mental state" when the call was made. The court sustained the objection on the ground that the questions called for hearsay that was not subject to any exception.

Defendant then made an extensive offer of proof in which his mother was questioned about a number of topics discussed in the telephone conversation. She proffered testimony, in which, *inter alia,* she repeated defendant's statements relating his observation of strange occurrences at his house in the weeks preceding the murder, such as rocks hitting the roof at night and objects disappearing, only to reappear days later. Defendant's mother also repeated statements that defendant had made in which he repeated statements that the victim had made to him. In those statements, the victim identified who was conspiring with her to kill defendant and told him that the strange occurrences were related to that plot.[1]

Defendant argued below that the evidence was admissible under OEC 803(3), which provides, in part:

"The following are not excluded by [OEC 802], even though the declarant is available as a witness:

"* * * * *

"A statement of the declarant's then existing state of mind, emotion, sensation or physical condition, such as intent, plan, motive, design, mental feeling, pain or bodily health, but not including a statement of memory or belief to prove the fact remembered or believed."

OEC 802 provides:

"Hearsay is not admissible except as provided in [OEC 801 to OEC 806] or as otherwise provided by law."

Hearsay is defined in OEC 801(3):

"As used in [OEC 801 to OEC 806], unless the context requires otherwise:

---

[1] Defendant represented to the court that the victim was his exclusive source of information about the existence and nature of the conspiracy against him, as well as the identities of the co-conspirators.

"* * * * *

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Defendant argues that OEC 803(3) applies, because the testimony is relevant to show his "then state of mind to show that he was not homicidal toward [the victim] but was in fact protective of her." He said that he expected the court to give a curative instruction that the statements "quoted from [defendant] or from other people in his presence [were] not offered to prove the truth of what was being said, but only to show the state of mind of the person who was saying them."

When defendant asked for a ruling about what was admissible from his extensive offer of proof, the court said:

"Well, that's a pretty large order.

"* * * * *

"The court will not allow it because of the fact it contains so much inadmissible evidence."

In ruling on the admissibility of a declarant's out-of-court statement,[2] the initial inquiry is to determine for what purpose the statement is offered. If the statement is offered for the truth of the matter asserted, by definition, it is hearsay[3] and inadmissible, except as provided in OEC 801 to OEC 806 or as otherwise provided by law. OEC 802. If, however, a statement is offered for something *other than* the truth of the matter asserted, it is not hearsay. In either case, the statement must be relevant to be admissible. OEC 402. Even when the statement is relevant, OEC 401, it may still be excluded under OEC 403 or some other provision of law.

Defendant's claimed reliance on the hearsay exception in OEC 803(3) and his request for an instruction that the out-of-court statements were not being offered for the truth of the matter asserted are logically inconsistent. Defendant's statements could only have been admitted under OEC 803 to prove the truth of the matter asserted — his state of mind.

---

[2] For purposes of discussion, we will assume that a "statement" has been made by a "declarant," as those terms are defined in OEC 801(1) and (2).

[3] Some statements that logically fall within the definition of hearsay are not hearsay under OEC 801(4).

■■    After the offer of proof, defendant's mother testified without objection that defendant said in the telephone conversation, *inter alia,* that he loved the victim and that he was going to try to protect her. Those are hearsay statements of defendant's then existing emotion and intent and are admissible under OEC 803(3). They tend to show that defendant loved the victim and that he intended to protect her in spite of his knowledge of her involvement in the plot. Those facts are relevant, because those "states of mind" tend to refute the state's evidence that defendant had a motive to murder the victim. By contrast, the hearsay and double hearsay of the defendant and the victim, in which they describe strange events that had taken place at the property and identify others involved in the plot, are not admissible under OEC 803(3), because they are not statements of an existing state of mind, emotion, sensation or physical condition of the declarant.

■    Defendant suggests obliquely that the out-of-court statements were introduced to show that defendant was filled with fear. *See Porter v. Headings,* 270 Or 281, 284, 527 P2d 403 (1974). In that event, the statements were not offered to prove that the strange events had, in fact, taken place or that the persons identified as co-conspirators were, in fact, involved in the plot, and OEC 803(3) does not apply. The statements may have minimal probative value to show that defendant was fearful, but his fear was not a fact of consequence to the determination of the action. OEC 401. However, even if we assume that the statements were relevant, the court was well within its discretion in excluding them, because their probative value, even with an instruction, is substantially outweighed by the risk of confusion of the issues by the jury. OEC 403. The trial court did not err in excluding the evidence.

■    Defendant also assigns error to the exclusion of similar testimony by the Lynns that defendant had said that the victim had said that "Howard" was a co-conspirator in the plot. Defendant argues that the state's objection to this evidence should have been overruled, because OEC 106 permits him to introduce the evidence. That rule provides:

> "When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same

subject, *where otherwise admissible,* may *at that time* be inquired into by the other; when a letter is read, the answer may at that time be given; and when a detached act, declaration, conversation or writing is given in evidence, any other act, declaration, conversation or writing which is necessary to make it understood may at that time also be given in evidence." (Emphasis supplied.)

OEC 106 is designed to prevent evidence from being presented to a jury out of context. The rule authorizes supplementary evidence about an act, declaration, conversation or writing to be presented contemporaneously with the initial evidence, Kirkpatrick, *Oregon Evidence* 38 (2d ed 1989), but the supplementary evidence must be "otherwise admissible." There must be an independent basis for admission apart from OEC 106. There was none here.

■    Defendant assigns error to the court's exclusion of testimony of John Scott, an acquaintance who, during a visit with the victim and defendant, noticed that the victim had a black eye and a bruised lip. He asked defendant, in the victim's presence, about the injuries. In an offer of proof, defense counsel asked Scott:

"Q:   Did [the victim] identify herself as being part of this conspiracy to hurt [defendant]?

"A:   No. She said she wasn't denying it."

The court refused to allow him to repeat that testimony before the jury. Defendant argues that the victim's hearsay statement was admissible under OEC 804(3)(c), because it was a statement against her penal interest.

In general, hearsay is admissible under OEC 804(3)(c) if the declarant is unavailable and if the statement, when it was made, tended to subject the declarant to criminal liability. Even if we assume that the court did err by excluding the victim's hearsay, the error does not require reversal. Several witnesses testified about the victim's participation in the plot to kill defendant, including his mother, both Lynns, defendant, his son and his son's girlfriend. Their testimony as to the victim's participation was not objected to and was admitted for the truth of the matter asserted. Later in the trial, the court changed its mind about the admissibility of the

victim's statement to Scott; the defendant described it thoroughly. After review of the transcript and examination of the exhibits, we are convinced that the error, if any, was harmless.

Defendant's remaining assignments of error relating to the exclusion of evidence do not merit discussion.

We now turn to four assignments of error relating to sentencing. Defendant was sentenced to life imprisonment. ORS 163.115(3)(a). The court, in compliance with ORS 163.115(3)(b), ordered defendant confined for a minimum of 10 years without possibility of parole, release on work release or any form of temporary leave or employment at a forest or work camp. Defendant claims that the court erred when, exercising its discretionary authority under ORS 163.115(3)(c), it added an additional 15 years of confinement with the same restrictions. He raises four constitutional challenges to ORS 163.115(3)(c). In *State v. Buckles,* 93 Or App 200, 760 P2d 903, *rev den* 307 Or 246 (1988), we upheld the statute against the same constitutional attacks. There is no need for us to address those arguments here.

■ In addition to the sentence of life imprisonment, the court also imposed a $25,000 fine. In his second assignment of error relating to sentencing, defendant claims that the court erred, because it has no authority to impose a fine as punishment for murder.[4] Although defendant did not advance that argument below, we nevertheless address his claim, because an objection is not a prerequisite to challenging a sentencing order that may be void. *State v. Edwards,* 103 Or App 410, 412, 797 P2d 402 (1990).

■ In imposing punishment for a criminal offense, Oregon courts are "limited strictly to the provisions of the applicable statute." *State v. Cotton,* 240 Or 252, 254, 400 P2d 1022 (1965); *State v. Duncan,* 15 Or App 101, 103, 514 P2d 1367 (1973). The state directs our attention to ORS 137.010(7), which provides, in part:

"When a person is convicted of an offense * * *, the court shall impose the following sentence:

"(a)  A term of imprisonment;

_____

[4] Our discussion is limited to murder as defined in ORS 163.115.

"(b) A fine;

"(c) Both imprisonment and a fine; or

"(d) Discharge of the defendant."

The state also cites ORS 161.625(2) as authority for the imposition of a fine. ORS 161.625 provides, in part:

"(1) A sentence to pay a fine for a Class A, B or C felony shall be a sentence to pay an amount, fixed by the court, not exceeding $100,000.

"(2) A sentence to pay a fine for an *unclassified felony* shall be a sentence to pay an amount, fixed by the court, as provided in the statute defining the crime." (Emphasis supplied.)

The state, citing ORS 161.535(2),[5] argues that murder is an "unclassified felony" as used in ORS 161.625(2). Even if we assume, *arguendo*, that the state is correct on that point, we nevertheless reject the state's argument that ORS 161.625(2) authorizes a fine for murder. Almost all of the crimes in the criminal code that define crimes are classified by statute as class A, B or C felonies or misdemeanors. *See, e.g.*, ORS 164.135(2), which provides that "[u]nauthorized use of a vehicle, boat or aircraft is a Class C felony." The "classification statutes," by themselves, say nothing about the court's authority to impose a fine as punishment for conviction of the crime. That authority is found primarily in ORS 161.625(1), which authorizes a court to impose a fine for *classified* felonies and sets an upper limit of $100,000. *State v. Lovelace*, 94 Or App 586, 591, 767 P2d 80, *rev den* 307 Or 571 (1989). ORS 161.625(2), on the other hand, gives a court authority to

---

[5] ORS 161.535 provides:

"(1) Felonies are classified for the purpose of sentence into the following categories:

"(a) Class A felonies;

"(b) Class B felonies;

"(c) Class C felonies; and

"(d) Unclassified felonies.

"(2) The particular classification of each felony defined in the Oregon Criminal Code, except murder under ORS 163.115 and treason under ORS 166.005, is expressly designated in the section defining the crime. An offense defined outside this code which, because of the express sentence provided is within the definition of ORS 161.525, shall be considered an unclassified felony."

impose a fine for *unclassified* felonies, but does not contain any dollar figure on what that fine may be. It provides that a court may order payment of an "amount, fixed by the court, as provided in the statute defining the crime." ORS 137.010(7) and ORS 161.625(2) authorize a court, in the abstract, to impose a fine, but only when the statute defining the crime explicitly provides for one and provides either a set amount, a range or upper limit dollar figure. ORS 163.115, which defines the crime of murder, does not contain any dollar figure relating to a fine. Indeed, the murder statute has no language at all about a fine.[6] The trial court erred, because it had no authority to impose a fine as punishment for defendant's murder conviction.

■ Defendant also claims that the court erred in sentencing him to pay a total of $30,000[7] in fines and $24,228.65 as reimbursement for court-appointed attorney expenses without making a determination of his ability to pay. ORS 161.645(1); ORS 161.665(3). The presentence investigation report indicates that defendant said that he received monthly payments of $1,000 disability income from the government. He made no claim at the sentencing hearing that the information was inaccurate. The prosecutor indicated to the court that the income stream would continue despite defendant's incarceration. The court took those matters into account when it imposed the fine and required payment of costs. There was no error as to the $5,000 fine or to the attorney expense reimbursement.

■ In his final assignment of error related to sentencing, defendant claims that the court erred by failing to make findings about why it was imposing consecutive sentences on the murder and unauthorized use of a vehicle convictions. We reject defendant's argument. The court had authority to impose consecutive sentences and was not required to make explicit findings as to the reasons why, because the criminal

---

[6] *Compare* ORS 462.990(2) which, by reference to other provisions of law, defines unclassified felony crimes relating to the racing of animals. It provides that any person convicted of those crimes "shall be guilty of a felony and punished by imprisonment in the custody of the Department of Corrections for not more than two years or by a fine of not more than $5,000 or by both."

[7] The court imposed a fine of $5,000 for defendant's conviction of unauthorized use of a vehicle.

conduct involved in the two convictions was not part of "the same continuous and uninterrupted course of conduct." ORS 137.123(1), (2). *Compare State v. Racicot,* 106 Or App 557, 809 P2d 726 (1991).

Convictions affirmed; remanded for resentencing.