Argued and submitted June 15, 1998; resubmitted En Banc March 3, 1999, affirmed June 30, 1999

## STATE OF OREGON,
*Respondent,*

*v.*

## GROVER C. CLEGG, JR.,
*Appellant.*

(94-02-30944; CA A90925)

984 P2d 332

Susan Elizabeth Reese argued the cause for appellant. With her on the briefs was Birmingham & Reese.

Ann Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Deits, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Wollheim, and Brewer, Judges.

DEITS, C. J.

Wollheim, J., dissenting.

## DEITS, C. J.

Defendant was charged with aggravated murder, felony murder, murder, conspiracy and solicitation to commit aggravated murder, solicitation to commit murder, first-degree assault, and first-degree burglary. ORS 163.095, ORS 163.115, ORS 161.435, ORS 161.450, ORS 163.185, ORS 164.225. All of the crimes arose from the murder of defendant's wife, Christina Clegg, on July 30, 1993, at the offices of the Albina Head Start program in Portland where she worked. The theory of the state's case was that defendant had hired two gunmen to stage a robbery of the office in order to kill defendant's wife. Defendant was convicted on all counts and sentenced to life imprisonment without the possibility of parole.[1] On appeal, defendant challenges a number of the trial court's rulings. We affirm as to all of defendant's assignments of error. We discuss only his assignment relating to the admissibility of the testimony of Kendra Hughes.

■ Because the jury found defendant guilty of all the crimes charged, we view the evidence presented at trial in the light most favorable to the state. *State v. Charboneau,* 323 Or 38, 40-41, 913 P2d 308 (1996). The evidence summarized below is that which is relevant to the assignment of error that we address.

Defendant Grover Clegg was married to the victim, Christina Clegg, for about five years. For several years before the murder, defendant worked the night shift at Consolidated Freightways. Defendant talked at work with coworkers about failed marriages and child support payments, making comments indicating that he was not happy in his marriage but that he was unwilling to pay child support for his children. Defendant told a coworker, Miller, that he would kill his wife before going through a difficult divorce and, although defendant laughed about it, Mooney thought he was serious. Defendant told another coworker, McGuire, that defendant wanted something to happen to his wife and

[1] Defendant and codefendants Randall Clegg and Reschard Steward were convicted of numerous offenses related to the murder of Christina Clegg and the assault on Tenicea Amos-Combs.

that he would like it if she were shot in the head. He mentioned that if she died, he would receive $100,000 in insurance and get to keep the children. Defendant told another coworker, Johnston, that it would be nice if someone ran over defendant's wife with a car or put a bullet in her head. Another coworker heard defendant say "the bitch is going to die. She's going to get run over by a truck."

In early July 1993, Randall Clegg, defendant's brother, approached Curtis Deskins and asked him if he wanted to make some money by doing a "hit." Randall told Deskins that Randall's brother wanted his wife dead. Several days later, Randall called Deskins on the telephone and asked if he was still interested in doing the hit. Deskins and Randall then conferred at Deskins's cousin's house in Hillsboro about the planned murder. Randall brought a blue photo album with him, showed Deskins pictures of the victim, and asked if he was still interested in killing her. Deskins's cousin also saw the photo album and heard Randall say to Deskins that defendant wanted "his girl offed." Randall told Deskins that Randall wanted it to look like a robbery and that Deskins should not shoot the victim in the head because defendant wanted an open casket. They agreed that Randall would pick up Deskins the following morning and drive him to where the victim worked. Randall gave Deskins $50 and agreed to give him more money after the victim was killed.

The following morning, Randall picked up Deskins. On their way to Portland, Randall stopped and called defendant and then reported to Deskins that they could not carry out their plan because the victim was at church. They agreed to try again the next day. Randall picked up Deskins again the following morning. Randall gave his car to Deskins and told him to return it after he had killed the victim. Deskins drove around Portland visiting friends and eventually wrecked Randall's car and sustained various injuries. Several days later, Deskins asked Randall if he still needed someone to kill his sister-in-law and Randall replied that he had already taken care of it.

In the summer of 1993, before the murder, Gloria Boone saw her boyfriend, Larry Matthews, with Reschard Steward and Randall. Matthews told Boone that a man was

going to pay him $1,000 to kill the man's wife. On July 29, 1993, the evening before the murder, the victim's daughter, then fourteen years old, saw Matthews in the basement of defendant's house with defendant and Randall. Defendant and Randall were showing Matthews a gun. The day after the murder the victim's 14-year-old daughter saw Randall with Steward.

On the day of the murder, defendant drove the victim to work. The victim told several coworkers that defendant was going to pick her up and they were going to lunch. It was a payday at the victim's workplace, and one of her coworkers offered to drive her to the bank after the coworker was through with a 10:00 a.m. appointment. Shortly after 10:00 a.m., the victim received a telephone call from defendant. The victim's statements to a coworker, Kendra Hughes, about the contents of that telephone call are the subject of the assignment of error that we will discuss. At trial, Hughes testified that at about 10:40 a.m., she went into the victim's office and observed that the victim seemed very happy. Hughes asked the victim what she was happy about, and the victim replied that her husband loved her. The victim told Hughes: "I just talked to Grover and told him Gladys was going to take me to the bank and he said, 'No, no, no,' and insisted I not let Gladys take me, that he was going to take me when he took me to lunch."

Hughes returned to her own office and several minutes later two men entered the building. One went immediately to the doorway of the victim's office and shot her multiple times. This occurred before any demand for money was made by either of the intruders. After shooting the victim the intruder came into Hughes's office and demanded money. As Hughes got up to take him down the hall to where the petty cash was kept, she heard several more shots and then saw the other intruder run out the door. The intruder with Hughes then followed the other out the door. No money was taken. The victim was shot through her wrist into her cheek, in the left arm, and three times in the back. Any of the shots in her back could have caused her death. Another of the victim's coworkers, Tenicea Amos-Combs, was shot in the lung.

Investigating officers quickly concluded that this likely was an intentional murder, rather than a robbery felony-murder. The investigating officers also thought that the defendant's behavior after the murder was unusual, noting that defendant was quite apathetic about his wife's death. One of the officers testified that defendant seemed completely disinterested in the investigation of the murder; and that defendant asked no questions about what had happened. The officer noted that, in his experience, that was unusual for family members. A number of persons who observed defendant after the murder also reported that defendant seemed completely unaffected by the event. A friend of the victim reported that she telephoned defendant and asked him to help her find out what happened to the victim. She testified that defendant responded:

" 'I'm not doing nothing.' He said—he said, 'What's done is done.' He said, 'I can't worry about that.'

"He said, 'I'm—I'm only going to worry about my boys and my golf game,' is what he said."

In addition, an employee of defendant's insurance company contacted the police to tell them that several hours after the murder defendant called his insurance agent to inquire about the net proceeds of the $100,000 life insurance policy on the victim. The employee said that, in his experience, this was unusual behavior. In the days following the murder, several of defendant's coworkers also came forward and related various statements made by defendant about wanting his wife dead. Several of the victim's relatives also contacted the police and expressed suspicion of defendant.

After seeing a news report about the murder, Deskins told several people that he had been asked to kill the victim. Steward told a number of individuals that Matthews and Randall were involved in the murder, indicating that Randall had acted as the go-between and that Matthews had done the shooting. In a later interview with the police, Steward said that he stole the car used to drive to the site of the murder, but denied participating in the murder. Two of the victim's coworkers, who were present at the murder scene, identified Steward as one of the two men who came

into the Head Start offices. Matthews was killed in an unrelated incident after Christina Clegg's murder.

■ Defendant assigns error to the trial court's admission of Kendra Hughes's testimony about what the victim told her about a telephone conversation between defendant and victim several minutes before the murder. Defendant asserts that the evidence is hearsay and that it does not fall within any of the exceptions to the hearsay rule. Defendant contends that the statements in question were offered for the truth of the matter asserted: to show that defendant attempted to keep the victim at her office, by discouraging her from going to the bank, so that she would be present when the gunmen arrived. Defendant points out that the prosecutor, during closing argument, emphasized this evidence to show that defendant wanted to keep the victim at her desk.[2]

The state responds first that this evidence was not hearsay because it was not offered for the truth of the matter asserted, OEC 801(3), and second, that the statements fall within the "state of mind" hearsay exception described in OEC 803(3). The state contends that the evidence was not offered for the truth of the matter asserted, pointing out that it was not the state's position that defendant actually intended to take the victim to the bank. The problem with the state's argument is that, like its evidence, it proves too much. There were a number of "matters" that the statements arguably "asserted," but only one of those matters is relevant to the facts of the case and the prosecution's theory, *i.e.*, that defendant in effect asked the victim *not* to go to the bank during the lunch hour when the "hit" was planned. The evidence was part of the state's attempt to prove *that* matter. Consequently, we conclude that the evidence was hearsay. OEC 801(3).

■ We next consider whether the evidence fits within the "state of mind" hearsay exception described in OEC 803(3), which provides:

---

[2] In this assignment of error, defendant points to the fact that Hughes's testimony at the bail hearing and at trial differed somewhat. However, as the trial court noted, such differences would be the proper subject of cross-examination, but did not constitute a reason to exclude the evidence.

"The following are not excluded by [the general rule against hearsay, OEC 802], even though the declarant is available as a witness:

"\* \* \* \* \*

"(3)   A statement of the declarant's then existing state of mind, emotion, sensation or physical condition, such as intent, plan, motive, design, mental feeling, pain or bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of the declarant's will."

The state argues that it has the right to show the state of mind of the victim at the time of and shortly before the homicide. The state relies on *State v. Engweiler*, 118 Or App 132, 846 P2d 1163, *rev den* 317 Or 486 (1993), for the proposition that this evidence was admissible under OEC 803(3) to establish the victim's state of mind. In *Engweiler*, the trial court admitted evidence that the victim of a rape and murder had expressed dislike for the defendant several hours before her death. We held that the statements were admissible under OEC 803(3) concerning the victim's "state of mind" because they were relevant to refute the allegation that the victim voluntarily had sex with the defendant. *Id.* at 135-36. The difference here, however, is that the evidence at issue was introduced to show *defendant's* state of mind or intentions, not the victim's state of mind. The victim's state of mind—that she was happy and that she intended to go to the bank after lunch—as shown by her relation of the conversation to her coworker, was not relevant to any material issue in this case. *See State v. Batty*, 109 Or App 62, 68-69, 819 P2d 732 (1991), *rev den* 312 Or 588 (1992) (statements showing declarant's state of mind are admissible under OEC 803(3) only if the declarant's state of mind is relevant under OEC 401).

The language of OEC 803(3) makes it clear that evidence is not excluded by the hearsay rule if it is a statement of the "*declarant's* then existing state of mind, emotion, sensation or physical condition, such as intent, plan, motive, design, mental feeling, pain or bodily health \* \* \*." (Emphasis added.) As noted above, the principal purpose of Kendra

Hughes's statements was not to show the victim's state of mind. Rather, the evidence was offered to show defendant's state of mind. The language of OEC 803(3) does not authorize the admission of evidence of the state of mind or intentions of someone other than the declarant.

The legislative commentary to the rule supports that reading of the rule:

> "With regard to the use, under subsection (3), of a declaration to prove an act on the part of a person other than the declarant when the act is itself an important issue in the case, the Legislative Assembly adopts the reasoning of the dissenting opinion by Justice Traynor in *People v. Alcalde*, 24 Cal 2d 177, 148 P2d 627, 633 (1944):
>
> > " 'It is my opinion that the trial court erred in admitting the testimony that the deceased said * * * that she was going out with "Frank" [the evening of her murder] * * * A declaration of intention is admissible to show that the declarant did the intended act * * * A declaration as to what one person intended to do, however, cannot safely be accepted as evidence of what another probably did * * * The declaration of the deceased in this case that she was going out with Frank is also a declaration that he was going out with her, and it could not be admitted for the limited purpose of showing that she went out with him at the time in question without necessarily showing that he went out with her.'
>
> "In approving this, the Legislative Assembly intends to limit the doctrine of *Mutual Life Insurance Co. v. Hillmon*, 145 US 285, 295-300, 12 S Ct 909, 36 L Ed 706 (1892), so as to render statements of intent by a declarant admissible only to prove the declarant's future conduct, not the future conduct of another person. *State v. Farnam*, 82 Or 211, 161 P 417 (1916), which accepted the *Hillmon* doctrine, is overruled to this extent."

Legislative Commentary, *quoted in* Laird C. Kirkpatrick, *Oregon Evidence,* 517 (3d ed 1996). The *Farnam* case that was legislatively overruled by the enactment of OEC 803(3) concerned an out-of-court statement made by a murder victim, shortly before her death, that she intended to meet with

the defendant. 82 Or at 239. Numerous cases, including *Hillmon*, involving similar facts were quoted in *Farnam* in support of the conclusion that the evidence was admissible not only to prove that the declarant actually met with another person but also that the other person met with the declarant. That expansive view of the "state of mind" exception to the hearsay rule, however, was clearly rejected by the legislature when it enacted OEC 803(3). Kendra Hughes's testimony regarding the victim's statement about intending to go to the bank with defendant after lunch was not admissible to show that defendant asked the victim *not* to go to the bank until after lunch—or inferentially, that defendant wanted the victim to stay at her office until the gunmen arrived.

■     We next turn to the question of whether the error requires reversal. Evidential error is not presumed to be prejudicial. OEC 103(1). We therefore must determine whether the admission of this evidence affected defendant's substantial rights. Evidential error does not require reversal if there is "(1) substantial and convincing evidence of guilt, in a criminal case, and (2) little if any likelihood that the error affected the verdict." *State v. Carr*, 302 Or 20, 27, 725 P2d 1287 (1986) (quoting Legislative Commentary to OEC 103); *State v. Larson*, 325 Or 15, 27-28, 933 P2d 958 (1997).

After considering all of the evidence in the record, we conclude that the evidence of defendant's guilt was substantial and convincing, and that there was little likelihood that the erroneously admitted evidence affected the verdict. Although the evidence here was circumstantial, it was compelling and was incompatible with defendant's innocence. As noted above, there was considerable evidence of problems in defendant's marriage. The evidence shows that the victim had expressed concern to a number of people about problems in the marriage and had expressed her unhappiness with defendant and how he was treating her. More significantly, defendant had told numerous coworkers that he wished that his wife were dead, that he wanted to kill her himself, and that "it would be nice to find somebody that would put a bullet in her head." He had also related to coworkers his dual motive of obtaining life insurance proceeds and avoiding divorce and child support payments. Close to the time of these statements by defendant, his brother, Randall, made

two successive hires of hitmen to "put the bullet" in defendant's wife. Randall told the first of the hitmen, Deskins, that defendant wanted the victim killed. Randall's statement about defendant's involvement was heard by Deskins's cousin, as well as by Deskins himself. There was absolutely no indication that Randall did—or had any reason to—plan the murder of defendant's wife, independently of defendant's own expressed intention to bring about her death.

In addition, the evidence shows that defendant met with Randall and one of the hired killers the night before the killing and that the three examined a gun together. Although Randall apparently had earlier associations with one or more of the men that he hired, there was no evidence to suggest that there was any previous contact between defendant and any of the actual or aspiring killers. Finally, as noted above, there was considerable evidence of defendant's apathy regarding his wife's death and the investigation of her death. It is telling that within hours of his wife's murder, defendant's prompt reaction was to contact his life insurance agent in pursuit of what he had revealed in his before-the-fact statements to be one of his goals in achieving her death. In sum, the circumstantial evidence here follows a very direct and uncomplicated inferential path: Defendant acted on his expressed desire to have his wife killed, by having his brother hire killers and meeting with one of them, and defendant then acted in the immediate aftermath of the murder to realize the gain that he had sought. We conclude that there was substantial and compelling evidence of guilt and, in view of that, there was little, if any, likelihood that the trial court's error in admitting the testimony of Kendra Hughes affected the verdict.

Affirmed.

**WOLLHEIM, J.,** dissenting.

The majority correctly concludes that hearsay evidence offered through witness Kendra Hughes was improperly admitted, because it was offered for the truth of the matter asserted and does not fall within any exception to the hearsay rule. 161 Or App at 209-10. However, the majority errs in declaring that this evidentiary error was not prejudicial.

Hughes testified that the murder victim told her immediately before the murder that defendant had called the victim and asked the victim not to go to the bank with a coworker that morning. The victim therefore remained at work where the gunmen found and shot her. The state used Hughes's testimony to establish that defendant participated in the murder by arranging for the victim to be in the location where the gunmen killed her. Hughes's hearsay evidence was the centerpiece of the state's case against defendant.

Although evidentiary error is not presumed to be prejudicial, OEC 103(1), the erroneous admission of this evidence undoubtedly prejudiced defendant. An appellate court may conclude that an evidentiary error is harmless only if there is substantial and convincing evidence of guilt, and if there is "little if any likelihood that the error affected the verdict." *State v. Carr*, 302 Or 20, 27, 725 P2d 1287 (1986). There is a *great* likelihood that the erroneously admitted evidence affected the verdict in this case, because it was the only evidence that defendant actively participated in the plot to murder the victim. While the other evidence on which the majority relies as evidence of defendant's guilt certainly was probative—*i.e.*, defendant telling people that he wanted the victim dead, defendant looking at a gun with his brother, Randall, and another individual, who might have been one of the gunmen, and defendant showing an unseemly interest in life insurance proceeds immediately after the murder—that evidence was nowhere nearly as strong as the inadmissible hearsay evidence that defendant arranged for the victim to be at the murder location when the gunmen arrived.

The evidence that defendant said he wanted the victim dead and that he asked her about life insurance proceeds immediately after the murder may tell us something about defendant's motives. However, motive is not an element of any of the offenses at issue here. The evidence that defendant and his brother were seen looking at a gun with Matthews, who was implicated as one of the gunmen but whose guilt was never established, is suggestive. However, no evidence established that the gun that defendant looked at with his brother and Matthews was the murder weapon, which was never found. This evidence, while probative, comes nowhere

near close to being as damning as the hearsay evidence by Hughes regarding the contents of the telephone call.

Perhaps the most disturbing portion of the majority's harmless error analysis, though, is its statement that "[t]here was absolutely no indication that Randall did—or had any reason to—plan the murder of defendant's wife, independently of defendant's own expressed intention to bring about her death." 161 Or App at 210-11. Randall has been found guilty of the murder and his conviction has been affirmed. As recounted in the majority's opinion, evidence established that Randall hired one of the gunmen, Steward, and both Randall and Steward have been convicted. It is sheer speculation, however, to say that defendant must have committed the murder as well simply because no evidence showed that Randall had a motive to commit the murder that did not relate to his brother. The majority endorses a "guilt by association" theory here; because defendant did not establish that he was *not* cooperating with his brother in accomplishing the murder, the majority will assume otherwise. Such an assumption reverses the burden of proof in a criminal case and is entirely unwarranted.

I am not suggesting that the state did not have a strong case against defendant. I agree with the majority that there was a fair amount of circumstantial evidence of defendant's guilt. However, there remains the question whether there was "little if any likelihood that the error [in admitting the hearsay evidence] affected the verdict." *Carr*, 302 Or at 27. Although the state sought admission of the evidence on the ground that it was not offered for the truth of the matter asserted, but to show state of mind, its arguments to the jury suggested that the *substance* of this hearsay evidence established defendant's guilt. In closing, the prosecutor made the following remarks:

> "Ms. Hughes testified that she recalls speaking with [the victim] when she came back that morning from her visit to one of the satellite offices. And she asked [the victim] what she was so happy about. And she said, 'My husband loves me.'
>
> "And she had talked about the fact that Gladys Waters, who also testified, told her that Gladys had offered to take

her to the bank that morning. And [defendant's] response to [the victim] was, 'No, no, no. Don't go.'

"Ask yourselves why under the evidence do you think [defendant] didn't want her to leave her [*sic*] that day. And think about the prior attempts on [the victim's] life that you've heard about. [Defendant] wanted to make sure she was there. [Defendant] told her, 'Don't go. I'll come and pick you up.' And it's because he wanted her there."

Given the very strength of the inadmissible evidence that the jury was asked to consider and given the state's suggestions to the jury on how to use that evidence, I cannot say that there is "little if any likelihood that the error affected the verdict." *Carr*, 302 Or at 27. On this record, the only inference that can be drawn is that the jury considered exactly what the state wanted it to consider—that the hearsay evidence established that defendant arranged for the victim to be at the location when the gunmen arrived. Such consideration was improper because, as the majority correctly notes, such use of that evidence is not permitted under the evidence code. However, the jury's consideration of that improperly admitted evidence did, most likely, affect the jury's verdict in this case. The majority errs in concluding otherwise.

I respectfully dissent.

Landau and Armstrong, JJ., join in this dissent.