Argued and submitted November 3, 2000, decision of Court of Appeals and
judgment of circuit court affirmed August 23, 2001

STATE OF OREGON,
*Respondent on Review,*

*v.*

GROVER CLEVELAND CLEGG, JR.,
*Petitioner on Review.*

(CC 94-02-30944; CA A90925; SC S46908)

31 P3d 408

Susan Elizabeth Reese, Portland, argued the cause and filed the brief for petitioner on review.

John C. Bradley, Deputy District Attorney, Portland, argued the cause and filed the brief for respondent on review. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Carson, Chief Justice, and Gillette, Durham, and Leeson, Justices.**

** Van Hoomissen, J., retired December 31, 2000, and did not participate in the decision of this case; Kulongoski, J., resigned June 14, 2001, and did not

GILLETTE, J.

participate in the decision of this case; Riggs and De Muniz, JJ., did not participate in the consideration or decision of this case.

## GILLETTE, J.

The issue in this criminal case is the admissibility at trial of certain testimony offered under various exceptions to the hearsay rule. The trial court admitted the testimony at issue and defendant was convicted of aggravated murder and other crimes. In a divided en banc opinion, the Court of Appeals affirmed defendant's convictions. *State v. Clegg*, 161 Or App 201, 984 P2d 332 (1999). For the reasons that follow, we hold that the testimony was admissible. We affirm the decision of the Court of Appeals, albeit on different grounds.

■ Because the jury convicted defendant on all counts, we view the evidence in the light most favorable to the state. *State v. Hayward*, 327 Or 393, 399, 963 P2d 667 (1998). On July 30, 1993, defendant's wife, Christina (Tina) Clegg, was shot and killed by two gunmen wearing ski masks who burst into the Albina Head Start office where Tina worked as a receptionist. One of the men walked directly toward Tina and shot her several times; the last three shots were in a straight line down her back, in a manner that indicated that the shooter had stood over her and shot downward. After shooting, the men asked for money, but left without taking anything of value. One of Tina's coworkers also was shot in the chest in the incident. One of the intruders carried a silver gun, but police never found the murder weapon. At least in part because of the manner in which Tina was murdered, police soon began to suspect that the motive for the attack was not robbery, as first thought, but Tina's murder.

Ultimately, defendant was indicted and charged with aggravated murder, conspiracy to commit aggravated murder, felony murder, intentional murder, assault, burglary, and two counts of solicitation to commit aggravated murder. The charges were based on allegations that defendant arranged for the murder of his wife. At trial, the state's theory of the case was that defendant had orchestrated the foregoing events because he was unhappy in his marriage to Tina, but did not want to risk either losing his home or paying child support as a result of divorce, and because he wished to collect the proceeds of a $100,000 insurance policy on Tina's life. According to the state, defendant asked his brother, Randall Clegg, to find someone to kill his wife.

The state presented evidence that Randall had made more than one effort to find a killer. Randall first hired a man named Deskins to murder Tina for about $1,000. Deskins borrowed a gun from a friend, and Randall loaned Deskins a car and provided him with a photo album containing pictures of Tina. Deskins did not carry out his assignment, however. On one occasion, Deskins failed to carry out the plan because Tina unexpectedly went to church. The next day, Randall again loaned Deskins his car, telling him to return it after he had committed the murder. However, Deskins instead picked up a few friends, began drinking, and ultimately drove Randall's car into a pole. The police officer who dealt with the collision found assorted unfired bullets in the car and, in the trunk, a box of shotgun shells, a long-sleeved black T-shirt, and a black ski mask.

About two weeks later, Randall hired two other individuals, Steward and Matthews, to kill Tina. The two also were to be paid $1,000 for the job. Tina's teenage daughter testified that, on the night before the murder, she saw defendant with Randall and Matthews in the basement of defendant's house; the Cleggs were showing Matthews a small silver gun. After the murder, Steward told friends that he had stolen the car that was used in the murder and that Matthews was the shooter. Two of Tina's fellow employees confirmed that Steward was one of the two intruders on the day of the murder, but was not the one who shot Tina.

Although there was direct evidence linking Randall, Steward, and Matthews to Tina's murder,[1] the state's case against defendant was circumstantial. The state presented evidence that, in the year before the murder, defendant often had talked to coworkers about his marital unhappiness and frequently stated that he would have his wife killed rather than pay child support. In addition, defendant told coworkers that, if his wife were to die, he would receive $100,000 in life

---

[1] Randall and Steward were charged with and convicted of crimes related to the murder and the assault on the coworker. The Court of Appeals affirmed those convictions without opinion, and this court subsequently denied review. *State v. Clegg*, 153 Or App 718, 957 P2d 1231, *rev den* 327 Or 431 (1998); *State v. Steward*, 151 Or App 804, 960 P2d 394 (1997), *rev den* 326 Or 465 (1998). Matthews never was brought to trial, because he was killed a few weeks after the murder in an unrelated incident.

insurance benefits, his mortgage would be paid off, and he would be able to keep his children. Defendant's insurance agent testified about defendant's efforts, within hours of Tina's murder, to inquire about the extent of the coverage. Finally, various witnesses, including the investigating police officers and defendant's friends and coworkers, testified about defendant's relative lack of grief over Tina's death and his lack of interest in apprehending the killers.

The piece of evidence tending most directly to connect defendant with the crime was testimony concerning a telephone conversation between defendant and Tina only moments before the murder. From that conversation, a juror could infer that defendant was attempting to ensure that Tina would be present in the office at the time that her killers arrived. The testimony came from of one Tina's coworkers, Hughes.

Hughes testified that, about two to five minutes before the murder, she walked up to Tina's window just as Tina was hanging up the telephone after a conversation with defendant.[2] Hughes observed that Tina looked happy; Hughes asked Tina what accounted for her good mood. Hughes stated that Tina "told me that her husband loved her." Hughes then testified as follows:

> "And I said, 'Oh and what brought that on?' And she said, 'I just talked to Grover and told him Gladys was going to take me to the bank and he said, "No, no, no," and insisted I not let Gladys take me, that he was going to take me when he took me to lunch.' "

In response to the prosecutor's announcement of intent to use the foregoing part of Hughes's testimony at trial, defendant objected on the ground that the statement was hearsay not within any exception to the hearsay rule. In the alternative, and to the extent that Hughes's testimony was admissible, defendant objected to it on the ground that its prejudicial effect outweighed its probative value.

---

[2] Other witnesses testified that Tina earlier had reported that she had been planning to go out to lunch with defendant. Still others confirmed that defendant telephoned his wife in the moments before the murder and that they had observed Hughes and Tina engaging in a conversation around that time.

The state argued, among other things, that Hughes's testimony was admissible under OEC 803, which provides, in part:

"The following are not excluded by [OEC 802, the general rule against hearsay], even though the declarant is available as a witness:

"\* \* \* \* \*

"(3)  A statement of the declarant's then existing state of mind, emotion, sensation or physical condition, such as intent, plan, motive, design, mental feeling, pain or bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of the declarant's will."

In particular, the state asserted that Tina's statement to Hughes was admissible because it concerned whether Tina intended to go to the bank with Gladys or to wait to do so until she went to lunch with her husband. Moreover, the state argued, Tina's statement to Hughes was admissible because it concerned the state of her marriage, which was relevant because the defense had contended that the Cleggs' marriage was happy and free of conflict.[3]

---

[3] The state argued in the alternative that the evidence was admissible under the so-called "residual exception" to the hearsay rule, OEC 804(3)(f), which provides:

"The following are not excluded by [OEC 802] if the declarant is unavailable as a witness:

"\* \* \* \* \*

"(f)  A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of the Oregon Evidence Code and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this paragraph unless the proponent of it makes known to the adverse party the intention to offer the statement and the particulars of it, including the name and address of the declarant, sufficiently in advance of the trial or hearing, or as soon as practicable after it becomes apparent that the statement is probative of the issues at hand, to provide the adverse party with a fair opportunity to prepare to meet it."

Because of our disposition of this case under OEC 803(3), we need not address whether Hughes's testimony would have been admissible in any event under OEC 804(3)(f).

The trial court admitted the testimony as state-of-mind evidence under OEC 803(3). Defendant did not ask for a limiting instruction, and none was given. At the conclusion of the trial, defendant was convicted on all counts and sentenced to life imprisonment without the possibility of parole.

On appeal, defendant assigned error to, among other things, the trial court's evidentiary ruling regarding that hearsay testimony. In response, the state argued that the trial court's ruling should be affirmed because Hughes's statement was not actually hearsay, inasmuch as it was not offered to prove the truth of the matter asserted. The state also repeated its contention that the statement, if it were hearsay, was admissible under OEC 803(3) as evidence of Tina's state of mind.

In an en banc opinion, a divided Court of Appeals agreed with defendant that the evidence was hearsay that was not admissible under the state-of-mind exception to the hearsay rule and that the trial court had erred in admitting it on that basis. *Clegg*, 161 Or App at 207-10.[4] Notwithstanding the Court of Appeals' conclusion that the trial court erred, however, that court affirmed defendant's convictions, because it concluded that the error was harmless. *Id.* at 211. We allowed defendant's petition for review.

■ "Hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OEC 801(3). The first issue that we address is whether Hughes's testimony included hearsay.

Hughes's testimony recounted her conversation with Tina. In that conversation, Tina in turn recounted her telephone conversation with defendant. As a result, Hughes's testimony included several out-of-court statements—Tina's statement to Hughes, which, in turn, included Tina's own statements to defendant during their phone conversation, and defendant's statements to Tina—each of which potentially poses a hearsay problem if offered for its truth. To determine whether Hughes's testimony was inadmissible

---

[4] The Court of Appeals did not consider the admissibility of the statement under the residual exception, OEC 804(3)(f).

hearsay, therefore, we first determine whether any statement was offered for its truth.[5]

■■  Neither Tina's statements to defendant nor defendant's statements to Tina during their telephone conversation were offered for their truth. The prosecution did not seek to prove either that Gladys was going to take Tina to the bank or that defendant was going to take Tina to lunch. Accordingly, those statements are not hearsay.[6] Tina's statement to Hughes, however, was offered to prove exactly what it asserted, namely, that defendant had just called Tina[7] and that, when Tina suggested to defendant that she might be leaving her office, he tried to persuade her not to go. Accordingly, those statements by Tina to Hughes are hearsay and are admissible only if they qualify under one of the exceptions to the hearsay rule.

In Oregon, "[h]earsay is not admissible except as provided in [OEC 801] to [OEC 806] or as otherwise provided by law." OEC 802. The question thus becomes whether Tina's statement to Hughes qualifies under one of the exceptions to which OEC 802 refers.

As noted, Tina's account of her conversation with defendant is hearsay, because it was offered to prove the truth of its contents, *viz.*, that Tina in fact told defendant that Gladys was going to take her to the bank and that defendant in fact responded by "insist[ing] I not let Gladys take me, that he was going to take me when he took me to lunch." The trial court ruled that Tina's statement was admissible under OEC 803(3), the "state-of-mind" exception. The Court of Appeals

---

[5] As noted, the state argued below that none of the challenged statements was offered for its truth but that, even if any were so offered, it was admissible.

[6] In any event, defendant's statements to Tina do not themselves present a second level of hearsay, even if offered for the truth of their contents. OEC 801(4)(b) provides, in part:

"A statement is *not hearsay* if:

"(b) The statement is offered against a party and is:

"(A) *That party's own statement* * * *.*"

(Emphasis added.)

[7] Other evidence at trial established that defendant telephoned Tina on the morning of the murder.

disagreed. The Court of Appeals' majority stated that the problem with applying OEC 803(3) was that

> "the evidence at issue was introduced to show *defendant's* state of mind or intentions, not the victim's state of mind. The victim's state of mind—that she was happy and that she intended to go to the bank after lunch—as shown by her relation of her conversation to her coworker, was not relevant to any material issue in this case."

*Clegg*, 161 Or App at 208 (emphasis in original). The court went on to state:

> "The language of OEC 803(3) makes it clear that evidence is not excluded by the hearsay rule if it is a statement of the '*declarant's* then existing state of mind, emotion, sensation or physical condition, such as intent, plan, motive, design, mental feeling, pain or bodily health * * *.' (Emphasis added.) As noted above, the principal purpose of Kendra Hughes's statements was not to show the victim's state of mind. Rather, the evidence was offered to show defendant's state of mind. The language of OEC 803(3) does not authorize the admission of evidence of the state of mind or intentions of someone other than the declarant.
>
> "* * * * *
>
> "Kendra Hughes's testimony regarding the victim's statement about intending to go to the bank with defendant after lunch was not admissible to show that defendant asked the victim *not* to go to the bank until after lunch—or inferentially, that defendant wanted the victim to stay at her office until the gunmen arrived."

*Clegg*, 161 Or App at 208-10 (emphasis in original).

In reaching the foregoing conclusion, the Court of Appeals appears improperly to have conflated three distinct inquiries, *viz.*: (1) whether the statement actually reflected some aspect of Tina's then-existing state of mind and, therefore, is *not excluded* by the general rule against hearsay; (2) whether the evidence is *relevant* and therefore *admissible* for the purpose of establishing that state of mind; and (3) whether the state may use that evidence, if it is admissible for that purpose, for any other purpose. We consider each question in turn.

■    Tina's report of her conversation with defendant is not a *direct* commentary on her "state of mind, emotion, sensation or physical condition," as described in OEC 803(3). However, a statement, for purposes of the hearsay rule, includes oral "assertions" as well as nonverbal conduct intended as an assertion. OEC 801(1)(a) and (b). Therefore, even if a statement merely reflects the declarant's state of mind or reasonably supports an inference as to the declarant's state of mind, it constitutes an assertion of the declarant's state of mind for purposes of OEC 803(3). *See* Christopher B. Mueller and Laird C. Kirkpatrick, 4 *Federal Evidence*, § 438, 417 (2d ed 1994) (statements should be read with reference to speaker's expressive or communicative intent; therefore, all statements that shed light on state of mind, not only those that expressly describe some mental aspect, fall within state-of-mind exception).

One inference that may be drawn from Tina's statement to Hughes is that Tina had intended to go with Gladys to the bank before lunch. That is, Tina was stating to Hughes her intent or plan. A statement of the declarant's then-existing intent or plan expressly is included as an example of a statement of the declarant's state of mind in OEC 803(3). As noted, defendant did not assert that, even if some parts of Tina's statement to Hughes were admissible, other parts were not. Thus, under the exception set out in OEC 803(3), Tina's assertion of her intent to allow Gladys to take her to the bank and her reasons for that intent are not excludable under the general rule against hearsay.

■    Although Tina's statement is not excluded by the rule against hearsay, it still would not be admissible unless it were relevant. As noted, the Court of Appeals concluded that Tina's intention to go to the bank "was not relevant to any material issue in this case." *Clegg*, 161 Or App at 208. In so concluding, however, the court took an unduly narrow view of the relevance standard.

■    Under OEC 401, "relevant evidence" is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." As this court stated in *State v. Titus,* "[t]he rule establishes a

'very low threshold' for the admission of evidence." 328 Or 475, 481, 982 P2d 1133 (1999) (quoting *State v. Hampton*, 317 Or 251, 255 n 8, 855 P2d 621 (1993)).

The state's theory of the case was that Tina's murder was the product of a plan devised by defendant and his brother to have her killed at her office during an apparent robbery attempt. The last time that the conspirators had planned to attack Tina, she foiled their plan by unexpectedly going to church. It was essential to the success of the plan that Tina be at her office at the time that the gunmen arrived. Tina's intent to go to the bank with Gladys again threatened to foil that plan. Evidence that Tina planned to be away from her place of work before lunch takes on particular relevance when considered together with evidence that defendant immediately sought to change Tina's plan and to induce her to remain where she might be killed pursuant to a murder-for-hire plan.[8] The evidence, therefore, was relevant under the minimal standard applicable to such determinations.

■    Having concluded that Tina's hearsay statement was admissible as relevant state-of-mind evidence, we turn to the question whether the state could use that testimony to prove defendant's participation in the murder-for-hire scheme.

■    As noted, defendant did not ask the trial court to give the jury an instruction limiting the use of Hughes's testimony. Generally, once evidence has been admitted without restriction, it can be used by the jury for *any* purpose. *See generally* OEC 105 ("When evidence which is admissible * * * for one purpose but not admissible * * * for another purpose is admitted, the court, upon request, shall restrict the

---

[8] In this connection, we note that the Court of Appeals' concern that the state principally meant to use Hughes's testimony to prove *defendant's* state of mind or intentions, and its reliance on the legislative commentary to OEC 803(3) to discredit that effort, is misplaced. The legislative commentary states that "statements of intent by a declarant [are] admissible only to prove the declarant's future conduct, not the future conduct of another person." *Clegg*, 161 Or App at 208. This is not a case in which evidence was being offered to show that defendant actually went to the bank later. The evidence *was* used to suggest by inference something about defendant's *motive*, but defendant has not even attempted to show why, if the evidence otherwise were admissible, the prosecution was not entitled to rely on the various inferences that were available from the evidence.

evidence to its proper scope and instruct the jury accordingly"); John W. Strong, 1 *McCormick on Evidence*, § 54, 242 (5th ed 1999) ("[F]ailure to make a sufficient objection to incompetent evidence waives any ground of complaint of the admission of the evidence. * * * But it has another equally important effect. If the evidence is received without objection, it becomes part of the evidence in the case and is usable as proof to the extent of its rational persuasive power.); *American Produce Co. v. Marion Creamery & Poultry Co.*, 214 Or 103, 112, 327 P2d 1104 (1958) (quoting earlier version of McCormick's *Evidence* to same effect). Moreover, as we have shown, the very timing of defendant's telephone call, even without information respecting its contents, had some tendency to prove what the contents demonstrated more clearly, *viz.*, that defendant wanted to keep Tina at the office. The prosecution was entitled to use Hughes's testimony to establish that defendant had participated in the murder-for-hire plan by persuading Tina not to go to the bank but, instead, to wait at her desk, thereby ensuring that she would be present when the gunmen arrived. The Court of Appeals' contrary ruling was error.

As the foregoing discussion demonstrates, Hughes's testimony concerning what Tina told her was admissible. The Court of Appeals' contrary ruling was error. As noted, that court nevertheless affirmed defendant's conviction, because it ruled that admission of Hughes's testimony, although error, was harmless. Thus, the Court of Appeals reached the correct result—affirmance.[9]

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

---

[9] Defendant's alternative argument that the prejudicial effect of Hughes's statement outweighed its probative value is not well taken. Defendant's request to Tina that she stay at the office is not like, for example, evidence of prior bad acts. Indeed, the request was intrinsically innocuous. It is only in context that the request's sinister quality is manifest.