Argued and submitted June 4, reversed and remanded in part; otherwise affirmed
August 8, 2001

# STATE OF OREGON,
*Respondent,*

*v.*

# EARL DOUGLAS WILKINS,
*Appellant.*

## 941036875; A91831

29 P3d 1144

Walter J. Todd argued the cause and filed the brief for appellant. Earl Douglas Wilkins filed the supplemental brief *pro se*.

Erika L. Hadlock, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, Janet A. Metcalf, Assistant Attorney General, and Kaye E. McDonald, Assistant Attorney General.

Before Haselton, Presiding Judge, and Wollheim and Brewer, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Defendant appeals his convictions on five counts of aggravated murder, one count of theft and one count of felon in possession of a firearm. ORS 163.095; ORS 164.055; ORS 166.270. He assigns error, *inter alia*, to the trial court's denial of surrebuttal, to the court's failure to merge several of his aggravated murder convictions, and to the trial court's imposition of a $100,000 compensatory fine. For the reasons set forth below, we affirm defendant's convictions, and remand for entry of a corrected judgment and for resentencing.

This case arises from the shooting deaths of Shango Wade and Deborah Payton in North Portland on September 30, 1994. As amplified below, the state contended that defendant intentionally murdered Wade and Payton to prevent them from disclosing his participation in a residential burglary. Defendant raised a defense of self-defense, asserting that the shootings occurred as he attempted to wrest a gun away from Wade. A jury ultimately convicted defendant of aggravated murder, as well as other crimes, and determined that defendant should be sentenced to life imprisonment without the possibility of parole.

In its case-in-chief, the state presented the following evidence: On September 22, 1994, Wade's apartment was burglarized, and various items were stolen, including a television and stereo equipment. Shortly thereafter, Wade's neighbor, McComb, observed three men in a nearby alley, and then saw two of the men carry a television and stereo speakers from a nearby abandoned house and load them into an older-model light blue Mercedes-Benz with a diesel engine. The man in the Mercedes was wearing a jacket with a eight-ball on it. McComb informed Wade of the men in the alley, and Wade and his friend Nealy pursued the car and apprehended one of the men involved. That man, however, escaped from them before the police arrived on the scene. Wade and Nealy found some of Wade's belongings in bushes near the alley.

According to defendant's girlfriend, Dunn, defendant owned a jacket with an eight-ball on it. Also according to Dunn, on the evening that the burglary took place, two men

asked defendant if he wanted to buy a television and some stereo equipment. Defendant agreed, and later returned with the items, which he stored at a relative's house. A witness at trial testified that the value of the equipment, used, was $900 to $1,000.

On September 30, 1994, Wade approached defendant while he was working at a hair salon in Portland. A customer at the salon, Anderson, overheard a confrontation between defendant and Wade, and stated that it concerned someone breaking into a house. According to Hicks, another customer at the salon who witnessed the confrontation, Wade said to defendant: "Man, I'm giving you fair warning." Wade and defendant walked to where defendant's light blue Mercedes was parked nearby, and defendant opened the trunk. Hicks heard Wade say to defendant: "Man, somebody had this car, either you or someone else was driving it." Wade walked away, and defendant returned to the hair salon, then left again a few minutes later and drove away.

Defendant returned to the salon shortly thereafter, borrowed a cordless telephone that belonged to one of the workers at the salon and called his girlfriend Dunn. According to Dunn, defendant told her that a man and a woman had been "talking shit" about "the stuff he bought the other day." Dunn stated that defendant told her that "he might have to drive them out somewhere secluded and take care of them because the nigger was threatening him." He then told her that they had come back, and that he would call her back later.

Shortly thereafter, one of the hair stylists in the salon, Sayles, heard two gunshots two or three seconds apart, looked out the window, and saw defendant with a gun in his hand. Defendant put the gun into his pants, walked to his car, got in and drove away. Sayles yelled out, "Earl just shot somebody," and ran outside. She saw that a red van had crashed into a telephone pole, looked in the van, and saw that there were people inside who had been shot. Brown, another stylist in the salon, also saw the bodies in the van, and tentatively identified the man in the van as the man who had been talking to defendant earlier. A few minutes later, defendant telephoned the salon and asked Brown if anyone had

mentioned his name. She told him no, and told him that the people in the van were dead. Defendant replied, "I know."

At the time of the shootings, two women, Cook and Holmes, drove by the van. Cook heard two gunshots, one or two seconds apart. She saw a man to her left, on the driver's side of the van, with his arm all the way in the driver's window. He pulled his arm out of the van and there was a black pistol in his hand. He then put the pistol away, walked calmly and casually to a blue Mercedes, got in and drove away. Cook pulled into an adjoining street to have Holmes call the police. She looked back and saw that the van had traveled across the street and smashed into a telephone pole. Holmes also heard the shots and saw a man standing by the van. He had his right hand in the van, pulled it out, put what appeared to be a gun into his waistband, then turned and casually headed toward a blue car. He had a telephone in his left hand.

Police arrived on the scene and found Wade unconscious in the driver's seat of the van with a gunshot wound in his head, and his passenger, Payton, dead of a gunshot wound to her head. Wade died in the hospital later that day from the gunshot wound to his head.

Shortly after the shootings, a driver going over the Fremont Bridge saw a person in a light blue Mercedes pull across traffic, throw a paper sack out of the window of the car into the river, then pull back through traffic and take the next exit. She took the car's license number and reported the event to the police. The license number matched that of defendant's car.

Defendant called Dunn back later that afternoon and told her that he "did it." Later that evening, defendant told Dunn that he had "glock[ed] the motherfuckers" and that "he wasn't leaving no witnesses." Dunn explained that by "glock" defendant meant "shoot."

In the defense case-in-chief, defendant testified as follows. On September 22, 1994, two men approached him on the street and asked him if he would like to buy a stereo. Defendant drove the men to a house located near Wade's

apartment. The men brought the equipment to the car and defendant gave them $180 or $200 for the equipment.

Defendant further testified that, on September 30, Wade came to the styling salon where defendant was working and asked who owned the blue Mercedes parked outside. Defendant told Wade that it was his car. Wade accused defendant of having the items taken in the burglary of his apartment. Defendant told Wade that he did not know him and did not have his property. Wade became upset, and defendant asked Wade to come outside. Wade then accused defendant of having Wade's drugs, and threatened to "fuck [defendant] up" and to come back with friends and "fuck the people up that work with [defendant]." Wade seemed exasperated and walked off.

Defendant went on to testify that shortly thereafter, while he was sitting outside on the steps having a telephone conversation with his girlfriend, Dunn, Wade returned and asked again about his belongings. Defendant said that he offered to contact people and ask them about Wade's stolen belongings. Wade then returned to his vehicle and pointed a gun at defendant.[1] Defendant grabbed Wade's hand to move the gun, and the gun went off. According to defendant, he then managed to wrestle the gun away from Wade, but Wade held on to the gun barrel and defendant's arm. Defendant testified that he then shot Wade because he feared for his life, and then

"after the second shot he, um—he went back inside, went back inside the vehicle, but he was holding onto me, and I was leaning inside of the car because he had a grip on my arm. And I asked him to like just let me go. And when he let me go, I was kind of like in shock from everything. And I was standing there with the gun in my hand, and then the car started up, and he drove off, and he pulled out into the street, and so I stepped back and put the gun in my pocket and I started walking toward my vehicle[.]"

Defendant then saw that Wade's vehicle had crashed into a nearby pole. As defendant drove away, he looked into Wade's

---

[1] In its case-in-chief, the state presented evidence from a large number of friends and family of Wade and Payton indicating that neither had ever owned a gun or had any interest in or experience with guns.

vehicle and, for the first time, saw that a woman passenger in the vehicle was dead. Defendant testified that he thought some people in a nearby car were friends of Wade who would try to shoot him, so he drove away. According to defendant, he then threw the gun off a bridge because:

> "I started thinking about seeing that lady with her head hanging out the window after the wreck, and made me sick, and I threw up, and I stopped my car, and I threw the rag over the bridge. When I got back in my car, the gun—I had put in my pocket. It came out of my pocket when I was driving, and I set it on the seat, and it was by the phone, and when I seen it, first thing I thought about is now I know why people hate guns, because guns killed my nephew and killed the people, and I threw the gun out over the bridge."

Defendant denied making the various incriminating statements to which Dunn had testified. The defense also presented evidence about Dunn's drug and alcohol abuse, as well as her poor mental health.

In addition, the defense presented the testimony of two other witnesses, Elliott and Kindred, who came forward many months after the shootings. Elliott testified that he was scheduled to have his hair done that day and, before his appointment, observed defendant in a heated dialogue with an occupant of a vehicle. According to Elliott, the person in the vehicle seemed to be brandishing something, but he could not tell if it was a weapon, and then, as Elliott drove away, he heard a loud sound.

Kindred testified that he was bicycling down the street when the shooting occurred. He indicated that he saw the driver of the van with a gun, that defendant grabbed it, and that he heard a shot, then a second shot a couple of seconds later. Kindred testified that he laughed because he was high on marijuana and he thought it was funny at the time. He testified that he was a gang member, and that he left the scene of the shooting because he had a gun and drugs in his possession. On cross-examination, the prosecutor elicited that Kindred came forward with his story after having a discussion with defendant about the crime while both were incarcerated in the same jail.

In rebuttal, the state recalled Dr. Larry Lewman, who had testified in the state's case-in-chief about his autopsies of the victims. Lewman testified that defendant's description of Wade keeping a grip on his arm after being shot in the head, as well as defendant's testimony regarding Wade starting up the vehicle and driving away, were not consistent with Wade's injury. According to Lewman, Wade had sustained a large caliber bullet injury to the left side of his brain, which not only would have rendered him instantly unconscious, but would also have impaired his ability to use his right hand to start the vehicle and put it in gear, as defendant had testified.

Defense counsel then argued that defendant should be permitted to introduce surrebuttal evidence by Dr. William Brady to contradict Lewman's opinion that defendant's version of events was inconsistent with the medical evidence. Defendant later submitted as an offer of proof an affidavit from Brady stating:

> "While I think it is medically unlikely that Mr. Wade started the van, put the vehicle into gear, and drove across the road after being shot, I do not believe this is an unequivocal medical impossibility, contrary to the position of Dr. Lewman."

The trial court denied defendant's request for surrebuttal on the ground that both parties knew well in advance of trial that "there was an issue over the manner in which this occurred."

As noted, the jury found defendant guilty on all counts. After the guilt phase of the trial was over, defendant proffered two additional affidavits from neurologists indicating that it was "entirely possible" or even "medically likely" that Wade had started up the car, put it in gear and driven off after receiving the gunshot wound to his head. The trial court indicated that it had denied surrebuttal "based upon a request timely made to put on Dr. Brady. All other requests I consider not timely made."

In the penalty phase of the proceeding, defendant received consecutive sentences of life imprisonment without possibility of parole on the aggravated murder convictions, a

six-month consecutive sentence on the theft conviction, and a concurrent sentence of 30 months on the conviction for felon in possession of a firearm. Defendant also was ordered to pay a $100,000 compensatory fine on the first of the aggravated murder convictions.

On appeal, defendant raises numerous challenges to his convictions and sentences. We write to discuss only two assignments of error, and reject without discussion the remaining assignments.

Defendant first argues that the trial court erred in denying him the opportunity to present surrebuttal evidence in response to the rebuttal evidence by Lewman that defendant's description of what occurred was not consistent with Wade's injury. As an initial matter, we note that defendant argues not only that the court erred in denying him the opportunity to present Brady's evidence in surrebuttal, but also in denying him the opportunity to put on evidence from the two neurologists whose affidavits defendant proffered long after the court had denied surrebuttal. The state asserts that defendant failed to preserve any error as to the propriety of calling any surrebuttal witnesses and, alternatively, that defendant failed to preserve any error as to the propriety of calling the neurologists as surrebuttal witnesses.

We conclude that defendant's arguments as to Brady's testimony are preserved, but we agree with the state that defendant failed to adequately preserve any error as to the exclusion of the opinions of the neurologists. When defense counsel first raised the issue of surrebuttal before cross-examination of Lewman on rebuttal, he stated: "[W]e intend to make a request for surrebuttal in the form of Dr. Brady, Your Honor[.]" After Lewman's testimony, defense counsel stated:

"Your Honor, first of all, on the matter of surrebuttal, this is something within the discretion of the court. As the court observed, we have no burden of proof. The testimony by Dr. Lewman, we would submit, represents new matter. We were first notified Dr. Lewman would be called in rebuttal this morning.

"The nature of his testimony was not disclosed. Dr. Lewman has left the jury with the impression that the

events attested to by Mr. Wilkins are medically impossible. That opinion is not shared by Dr. Brady, who's prepared to present his opinion. He's available late this afternoon or first thing tomorrow morning.

"I had occasion to speak with him briefly during the recess. I'm not an expert on neurology or pathology. And to deny Mr. Wilkins the opportunity to present surrebuttal denies him his rights * * *.

"The court is familiar with Dr. Brady, former state medical examiner. He's been recognized and qualified as an expert witness, and has testified many times in courts in this county as well as other courts throughout the state, and I believe the United States, if not the other courts.

"Additionally, Your Honor, the testimony by Dr. Lewman prompts the need to consult with and present evidence from someone specialized in neurology, because we're dealing with a function of the brain. And for the same reasons and the same arguments submitted before, to deny our right to surrebuttal denies [various constitutional rights]."

The trial court denied surrebuttal. Before closing arguments, defendant added that, in addition to an offer of proof as to Brady's medical opinion, he would like to proffer the other medical evidence. The trial court indicated that its ruling on surrebuttal related only to the testimony of Brady.

■　　　Defense counsel informed the court that Brady was prepared to testify on surrebuttal, and that he did not share Lewman's opinion that defendant's version of events was medically impossible. We therefore reject the state's argument that defendant "gave little indication of the content of his proposed surrebuttal evidence" and thus failed to preserve this issue. Although defense counsel's statement about how Brady would testify was brief, it was sufficient to preserve any error as to the exclusion of Brady's opinion as to the medical possibility of the events described by defendant.

■　　　Conversely, however, defense counsel's statement that Lewman's testimony "prompt[ed] the need to consult with and present evidence from someone specialized in neurology, because we're dealing with a function of the brain," was insufficient to put the court on notice that defendant wished to present testimony from two neurologists that it

was medically possible or likely that events occurred as defendant described them. As is apparent from defense counsel's statement, no neurologists had yet been consulted. Because defendant had not yet consulted neurologists, he was not in a position to assert what their testimony might show. Defendant was not in the position to make an offer of proof at that time as to how such neurologists might testify, and in fact did not make any such offer of proof until much later. Defendant's arguments as to the testimony of the neurologists therefore was not properly preserved. *See generally State v. Busby*, 315 Or 292, 298, 844 P2d 897 (1993) (an offer of proof must indicate what the evidence would have shown); *compare State v. Wright*, 323 Or 8, 14, 913 P2d 321 (1996) (offer of proof was sufficient even though it did not identify proposed witnesses with specificity, because content of proposed testimony was made clear).

◼      Thus, the only question presented as to surrebuttal is whether the court erred in denying defendant the opportunity to present Brady's testimony to contradict Lewman's opinion that defendant's version of events was not medically possible. Generally, whether to permit surrebuttal evidence is considered to be a matter within the discretion of the trial court. *See State v. Gleason*, 141 Or App 485, 492, 919 P2d 1184, *rev den* 324 Or 323 (1996). However, under certain circumstances, a court may err as a matter of law in denying a party the opportunity to present surrebuttal evidence. *See State v. Reynolds*, 324 Or 550, 931 P2d 94 (1997).

◼      In *Reynolds*, the defendant was denied the opportunity to put on evidence as to his truthful character in his case-in-chief, because the state had not, at that point, introduced evidence attacking the defendant's character for truthfulness. *See* OEC 608(1). In rebuttal, the state called a witness to impeach the defendant's character for truthfulness. 324 Or at 553. The defendant sought surrebuttal to respond to that testimony, but the trial court denied it. *Id.* at 557. On appeal, the court characterized the trial court's statements that surrebuttal was an "extraordinary remedy" that was appropriate only in "extreme circumstances" as "legally incorrect." *Id.* at 558. The court went on: "Because the court ruled as a matter of law that *no* surrebuttal evidence would be allowed on the issue of defendant's character for truthfulness after the

state had attacked his character for truthfulness, it erred." *Id*. In doing so, the trial court had "substantially affected defendant's right to fully present his theory of defense." *Id*. at 559. The court also noted, however:

> "There may be circumstances in which, because the battle over the credibility of a particular witness is tangential, a trial court's discretionary choice not to permit a side battle over that question may be sustained. But where, as here, a defendant's credibility is central to the defense, we find no such flexibility." *Id*. at 559 n 5.

The state argues that *Reynolds* compels the allowance of surrebuttal only when two conditions are satisfied. First, the proffered evidence must be "central to the defense." *Reynolds*, 324 Or at 559 n 5. Second, the defendant's failure to present that evidence in the defense case-in-chief must be excused either because (as in *Reynolds*) that evidence could not have been offered earlier or because the proposed surrebuttal evidence "is offered to counter adverse evidence that was not, and that could have been, anticipated." The state further contends that denial of surrebuttal here was proper because

> "as the trial court found, defendant's suggested surrebuttal evidence was offered to meet evidence that he could have and should have anticipated. In addition, defendant could have presented his proposed surrebuttal evidence during his case-in-chief."

We do not agree that this case is materially distinguishable from *Reynolds*. While the state is correct that nothing *prevented* defendant from introducing the ultimately proffered surrebuttal evidence in his case-in-chief, there was no reason for him to do so. That is, in the totality of the circumstances, defendant had no reason to anticipate that the state would mount a full-fledged attack on a relatively immaterial and collateral aspect of his account. As noted above, it is undisputed that the evidence showed that the van did, in fact, travel some distance after the shooting. Nothing in the state's case-in-chief suggested that the driver of the van was not somehow responsible for the van's movement after the shooting. Thus, while the trial court certainly was correct that defendant could have anticipated that the state, on

rebuttal, would contest his description of how the *shooting* occurred, we disagree with the trial court that defendant reasonably should have anticipated an attack on his description of how the van traveled from the place of the shooting to the place where it ultimately crashed.[2]

*State v. Fischer*, 232 Or 558, 376 P2d 418 (1962), is instructive. In *Fischer*, the defendant was charged with and convicted of manslaughter of her husband. *Id.* at 560. Evidence showed that the victim died of a gunshot wound, and that the defendant was alone in the house with the victim some 16 hours after the shooting. *Id.* at 561-62. At trial, the state introduced a written statement, signed by the defendant, stating that "following a brief struggle with her husband she wrested the gun from his possession, stepped back and fired." *Id.* at 562. When defendant testified in the defense case-in-chief, she denied making that comment and claimed that the words attributed to her were, in fact, those of the officer who took her statement. *Id.* at 563. Over the defendant's objections, the trial court permitted the state to present, as rebuttal, the testimony of another officer who had overheard the defendant's remarks and who testified that the writing accurately transcribed the defendant's own words. *Id.*

On appeal, the defendant assigned error to the court's refusal to strike that rebuttal testimony. In holding that the trial court properly admitted that evidence, the court first stated the general principle:

"Rebuttal testimony should be limited to evidence made necessary by the opponent's evidence. It is within the sound

---

[2] Moreover, as defendant noted at trial, he had "no burden of proof" on the issue of self-defense. When a defense other than an affirmative defense is raised by a defendant, the state has the burden of disproving that defense beyond a reasonable doubt. ORS 161.055(1). A defendant may raise such a defense in his case-in-chief. ORS 161.055(3). It follows that when a defendant testifies in his case-in-chief that he acted in self-defense, the state may attempt to disprove that defense during rebuttal. However, to say that a defendant should be required to anticipate how the state will meet its burden of disproving a defense and to negate that anticipated evidence in his case-in-chief could be viewed as shifting the burden of that defense, contrary to ORS 161.055(1). The trial court in the present case cited as a reason to *deny* surrebuttal that defendant had no burden of proof. That defendant had no burden of proof, however, militates in favor of, rather than against, surrebuttal. When the state for the first time in rebuttal introduces new evidence to disprove a defense raised in a defendant's case-in-chief on which the state bears the burden of proof, a defendant should have the opportunity to meet and counter that evidence.

discretion of the trial court to allow in rebuttal testimony which becomes relevant in rebuttal even though it might have been used in the case-in-chief." *Id.* at 563.

The court then noted that the state could have introduced the evidence presented on rebuttal as part of its case-in-chief—that is, it would have been relevant, although cumulative. Nevertheless, that evidence was properly admitted on rebuttal:

"The state had no reason to suspect during its case-in-chief that the defendant would disclaim the authorship of her signed statement. The purpose of the general rule against using in rebuttal testimony that should have been used in chief is to prevent surprise or other unfair tactics. When a party opens up a new matter as a special point of inquiry, the reason for the rule evaporates and the testimony may be used to meet the new assertion." *Id.* at 564.

The present case, although involving surrebuttal rather than rebuttal, is similar to *Fischer*. Nothing prevented defendant from introducing medical evidence in his case-in-chief that was consistent with his testimony. It would have been relevant. However, that evidence assumed the particular significance at issue here—that defendant's version of events was, in fact, credible—only after the state, on rebuttal, presented Lewman's testimony calling into question the veracity of defendant's description of how the van moved after the shooting. That is, Lewman's "medical impossibility" challenge to that aspect of defendant's account "open[ed] up a new matter as a special point of inquiry." *Fischer*, 232 Or at 564. In that circumstance, defendant's proffer of Brady's testimony "to meet that new assertion," *id.*, did not partake of impermissible "surprise or other unfair tactics." *Id.* Thus, the trial court here would not have abused its discretion if it had *allowed* Brady's testimony on surrebuttal.

That does not, however, answer whether the court erred in *excluding* Brady's potential surrebuttal testimony. As noted, the court in *Reynolds* indicated that, in some circumstances, where "the battle over the credibility of a particular witness is tangential, a trial court's discretionary choice not to permit a side battle over that question may be sustained." 324 Or at 559 n 5. However, the court went on to hold

that where "a defendant's credibility is central to the defense," a trial court does not have discretion to deny surrebuttal. *Id.*

■ Here, as a *substantive* matter, the question of whether the van moved after the shooting due to a conscious act of Wade, or for some other reason, was not, in fact, important either to the state's case-in-chief or to the defense of self-defense. However, the question of whether defendant was truthful with respect to that, or any other, aspect of his account was potentially critical, particularly given the familiar "witness false in part" principle.[3] We thus conclude that, because defendant's credibility was central to his claim of self-defense, and because the state's evidence on rebuttal attacked defendant's credibility in a new and reasonably unforseen manner, the trial court erred in refusing to permit the defense to present Brady's testimony on surrebuttal.

■■ Erroneous exclusion of evidence is not presumed to be prejudicial. OEC 103(1). "A defendant in a criminal case assigning error to the exclusion * * * of evidence must establish that the error was not harmless." *State v. Lotches*, 331 Or 455, 487, 17 P3d 1045 (2000). Evidentiary error is harmless if there is little likelihood that it affected the verdict. *State v. Phillips*, 314 Or 460, 471, 840 P2d 666 (1992). Defendant argues and, as discussed above, we agree, that Lewman's testimony called his credibility into question, and that his credibility was central to the case because of his defense of self-defense. Several other factors also support defendant's position: The prosecutor briefly mentioned this issue of credibility in closing argument; the jury was instructed that it could distrust all of the testimony of a witness who had lied in

---

[3] The trial court did, in fact, give the uniform "witness false in part" jury instruction (UCrJI 1024):

"Now, a witness who lies under oath in some part of his or her testimony is likely to lie in other parts of his or her testimony. Therefore, if you find that a witness has lied in some part of his or her testimony, then you may distrust the rest of the witness' testimony.

"Sometimes witnesses who are not lying may give incorrect testimony. They may forget matters or may contradict themselves. Also, different witnesses may observe or remember an event differently.

"You have the sole responsibility to determine what testimony, or portions of testimony, you will or will not rely on in reaching your verdict."

some part of his testimony, *see* 175 Or App at 581 n 2; two witnesses, albeit not necessarily the most helpful or credible of witnesses, supported his defense of self-defense; and evidence of Dunn's drug and alcohol use around the time of the shooting called into question her ability to accurately perceive and recall the events in question.

■     We conclude, nevertheless, that the error in excluding the proffered surrebuttal testimony was harmless. We so conclude not only because of the strength of the state's case, but also—at least as significantly—because of the weakness of Brady's proposed surrebuttal testimony.

We begin by noting that, in the totality of the circumstances of this case, the credibility of defendant's account of how the van moved across the street was not a focus or a significant theme of the prosecution. While that matter was alluded to briefly in closing argument, the prosecution's focus was on the testimony of the disinterested witnesses who heard the shots and saw defendant walk calmly away from the van, and on Dunn, who stated that, before the shooting, defendant informed her of his intention to harm the victims, and that, after the shooting, defendant told her that he had left "no witnesses." Other evidence contradicted defendant's claim of self-defense: defendant's telephone call to the salon shortly after the shooting asking if his name had been mentioned and indicating that he knew the victims were dead; and defendant's testimony that he threw the gun off the bridge, not to conceal evidence of a crime but because he had a sudden revelation that guns kill people.

At least as important to our harmless error analysis is the weakness of the proffered surrebuttal evidence. Brady indicated that it was "medically *unlikely*" that Mr. Wade started the van, put the vehicle into gear, and drove across the road after being shot." (Emphasis added.) He did not, however, believe that it was an "unequivocal medical impossibility." In short, the difference between Lewman's rebuttal testimony and Brady's proffered surrebuttal is that the former stated that defendant's description of events was medically impossible, and the latter would have said that it was "medically unlikely." Thus, even if the jury had heard

Brady's evidence, that evidence, at best, would have supported a conclusion that it was "unlikely" that events occurred as defendant had portrayed them. Given the weakness of the proffered surrebuttal and the strength of the state's case, we conclude that there is little likelihood that the denial of surrebuttal affected the verdict. Consequently, the exclusion of Brady's surrebuttal testimony was not reversible error.

Defendant also assigns error to the trial court's failure to merge several of his aggravated murder convictions, and to the court's imposition of a compensatory fine. Defendant was convicted of two counts of aggravated murder relating to the killing of Wade based on two separate theories: that the crime occurred in the same criminal episode in which defendant caused the death of Payton, ORS 163.095(1)(d); and that the crime was committed to conceal the commission and identity of the perpetrator of the crime of theft by receiving, ORS 163.095(2)(e). Defendant was convicted of three counts of aggravated murder relating to the killing of Payton based on three separate theories: that the crime occurred in the same criminal episode in which defendant caused the death of Wade, ORS 163.095(1)(d); that the crime was committed to conceal the commission and identity of the perpetrator of the crime of theft by receiving, ORS 163.095(2)(e); and that the crime was committed to conceal the commission of and identity of the perpetrator of the crime of murder, ORS 163.095(2)(e). The trial court merged the final two counts, relating to the murder of Payton to conceal the commission of crimes, but did not merge any of the others. The trial court also imposed a compensatory fine of $100,000 on the conviction for the murder of Wade in the same criminal episode in which defendant caused the death of Payton. Defendant argues on appeal that the trial court erred in failing to merge all of the aggravated murder convictions relating to the killing of Wade, in failing to merge all of the aggravated murder convictions relating to the killing of Payton, and in imposing the compensatory fine.

The state responds that this court should not consider defendant's arguments on appeal. The state acknowledges that, under *State v. Barrett*, 331 Or 27, 10 P3d 901 (2000), the trial court should have merged the aggravated

murder counts relating to each victim, and that the error is apparent on the face of the record. The state argues, however, that this court should decline to exercise its discretion to correct this error on review because correction of the error will give no tangible benefit to defendant. Because defendant received life sentences without the possibility of parole on all of the aggravated murder convictions, it scarcely matters, according to the state, whether he will be serving four life sentences for the remainder of his life or two life sentences for the remainder of his life. Also, the state argues, the egregiousness of defendant's crimes militates against correction of the errors.

■ We agree with the parties that the error is apparent on the face of the record, and thus we have discretion to correct it. *See generally State v. Brown*, 310 Or 347, 356, 800 P2d 259 (1990) (error is apparent on the face of the record if the legal point is obvious, and not reasonably in dispute). In deciding whether to exercise our discretion to correct such an error, we consider the competing interests of the parties, the nature of the case, the gravity of the error, the ends of justice, and whether the trial court was given an opportunity to correct the error. *Ailes v. Portland Meadows*, 312 Or 376, 382 n 2, 823 P2d 956 (1991).

■ Weighing in favor of correcting the error is the nature of the case and the gravity of the error. As noted, the error involved the imposition of two more convictions for aggravated murder than should have been imposed. As to the competing interests of the parties, it is true that, as the state points out, correction of the error will not serve to shorten the life sentences that defendant is serving. However, for the same reason, it would be difficult to say that the state has any strong interest in maintaining the additional erroneous convictions. The trial court was not given an opportunity to correct the error. However, had the trial court been presented with this issue, it is highly unlikely that the error in question would have been avoided, because case law from this court before the *Barrett* decision suggested that the convictions at issue would *not*, in fact, be merged. *See, e.g., State v. Hessel*, 117 Or App 113, 844 P2d 209 (1992), *rev den* 318 Or 26 (1993) (convictions for six counts of aggravated murder held proper although all related to the killing of the same victim).

Finally, as to the state's arguments that the egregiousness of defendant's crimes should militate against correction of the error, the fact is that any aggravated murder is, by its very nature, quite egregious. We are not prepared to say that multiple convictions for the same crime that are erroneous as a matter of law should remain in place simply because the crime at issue was egregious. Considering all of the factors involved, we choose to exercise our discretion to correct the error in failing to merge defendant's aggravated murder convictions. On remand, the trial court should enter a corrected judgment and resentence defendant on his aggravated murder convictions in light of *Barrett*.[4]

Defendant further argues that the trial court erred in imposing a compensatory fine of $100,000 on one of the aggravated murder convictions. The state acknowledges that the trial court lacked statutory authority to impose the fine, but argues that defendant failed to preserve the error because he did not raise the issue until his motion for a new trial. The state recognizes that we have previously considered such an error in the first instance on appeal. *See State v. Batty*, 109 Or App 62, 71-72, 819 P2d 732 (1991), *rev den* 312 Or 588 (1992). The state suggests, however, that in light of subsequent case law concerning plain error and the court's discretion to correct such error, the *Batty* case should not stand for the proposition that such unpreserved errors necessarily should be corrected on appeal. We need not consider in the present case whether there was "plain error" or whether, were it the only error in the case, we would exercise our discretion to correct it. We have already determined that the case must be remanded for entry of a corrected judgment and resentencing. Given that the entire case must be remanded for resentencing, ORS 138.222(5), the court necessarily will have the opportunity to address defendant's arguments as to the compensatory fine.

---

[4] Where a defendant has been found guilty of aggravated murder under multiple theories all relating to the same victim, the court is to "enter one judgment of conviction reflecting the defendant's guilt on the charge of aggravated murder, which judgment separately would enumerate each of the existing aggravating factors." *State v. Barrett*, 331 Or 27, 37, 10 P3d 901 (2000).

Reversed and remanded for entry of corrected judgment reflecting one aggravated murder conviction for each of the two victims, separately enumerating each of the existing aggravating factors, and for resentencing; otherwise affirmed.